**Richard F. PLECHNER, Plaintiff,**

**and**

**Alfred Avins, Intervenor-Plaintiff, Appellants,**

**v.**

**WIDENER COLLEGE, INC., a Pennsylvania Corporation, and the Delaware Law School of Widener College, Inc., a Delaware Corporation, Appellees.**

**No. 76–2291.**

United States Court of Appeals, Third Circuit.

Argued Oct. 4, 1977.

Decided Dec. 28, 1977.

---

Alfred Avins, Wilmington, Del., for appellants.

Franklin Poul, Judith R. Cohn, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for appellees, Widener College, Inc. and The Delaware Law School of Widener College, Inc.

Kenneth F. Boehm, Sterling, Va., for amicus curiae, Young Americans for Freedom, Legal Action Committee.

George P. Williams, III, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellee, The American Bar Ass'n.

Before GIBBONS and WEIS, Circuit Judges and MEANOR, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

The necessity for the newly established Delaware Law School to affiliate with Widener College as a prelude to American Bar Association accreditation is the basic dispute underlying this appeal. We accept the district court's conclusions that affiliation was in the best interests of the law school as well as its students and that the procedures employed were not legally deficient. After careful consideration of this issue and others raised by the plaintiffs, we affirm the judgment of the district court refusing to sever the two institutions.

---

* The Honorable H. Curtis Meanor, United States District Court for the District of New Jersey, sitting by designation.

Plaintiff Plechner, a trustee of the Delaware Law School, alleged irregularities in the affiliation with Widener College in 1975, including duress and coercion by the American Bar Association. He brought suit in the Eastern District of Pennsylvania seeking various forms of relief, including an injunction to set aside the election of a new Board of Trustees by Widener. Appellant Avins, the first dean of the law school and also a trustee, intervened on essentially the same grounds. The district court dismissed the American Bar Association for lack of diverse citizenship. The plaintiff's demands for a jury were refused, and after a bench trial, judgment was entered for the defendants.[1]

The case encompasses the brief history of the Delaware Law School as an independent institution, beginning in June, 1971 when plaintiff Alfred Avins secured a Delaware charter for the school as a nonprofit corporation. Governance was vested in a three-member board of trustees, enlarged in 1973 to seven. The charter provided that the trustees had the power to dissolve the school, donate its assets to another school, merge, or affiliate with another educational institution. Power to amend the charter was also included.

The school opened for its first evening classes in October, 1971. At the inception, Mr. Avins was the only full-time faculty member and in addition to a loan of $1,900, he advanced to the school all but $5,000 of his salary. The bulk of the initial financing, however, was obtained through tuition payments by the students. Through Avins' energy and resourcefulness, the faculty was gradually enlarged and the physical facilities, including the library, were improved in the years following. The district court remarked that Avins' achievement was astounding and that he single-handedly was responsible for the creation of a viable law school.

The school encountered some opposition in its efforts to obtain degree-granting powers and it was not until November, 1974 that the State of Delaware conferred such authority. Equally important to the students, however, was the school's accreditation by the American Bar Association. Without such approval, graduates would not be eligible to take the bar examinations in most states.

The procedures for provisional accreditation begin with an inspection by an ABA team which makes a report and recommendation to the Committee on Accreditation of the Council of the Section of Legal Education and Admission to the Bar. An affirmative recommendation by the council is reported to the ABA's House of Delegates for final action by that body.[2]

The first catalogue of the Delaware Law School stated that ". . . it is expected that by the end of the second year of operation, the law school should be able to be ready for A.B.A. inspection." The second catalogue said that the school would be ready for an inspection in the spring of 1973. On September 15, 1973, the Board of Trustees called for an inspection as soon as possible.

In January, 1974, an ABA team visited the school and submitted an extremely adverse report. The inspectors were critical of the physical facilities, including the library; the faculty was said to have limited teaching experience, was underpaid and not full time. The report referred to the institution as a "one man law school" and recommended against accreditation.

In May and July, 1974, two additional inspections were made and while improvements were noted the reports were unfavorable. Students and their parents became increasingly concerned about accreditation prospects. As a result of mounting pressure Avins resigned as dean. He remained on the Board, however, and was given the title of Dean Emeritus. Before

1. The opinion of the district court is reported at 418 F.Supp. 1282 (E.D.Pa.1976).

2. The procedure and standards for accreditation are published in Approval of Law Schools, American Bar Association Standards and Rules of Procedure (1973).

his resignation became effective, Avins contacted Arthur Weeks, then a professor at Cumberland Law School of Samford University and persuaded him to become dean at Delaware.

Another ABA team inspected the school in January of 1975 and although it found substantial improvements, did not believe that the school was ready for accreditation. The following month, Dean Weeks, along with several trustees and students, appeared in Chicago before the Accreditation Committee in an unsuccessful plea for reconsideration. On his return to Wilmington, Weeks reported to the trustees and recommended that the law school affiliate with a college or university, suggesting among others Widener College and the University of Delaware. Informal comments by ABA members of the inspection team and the Chairman of the House of Delegates had indicated that affiliation with an established institution would considerably enhance the school's prospects for accreditation.

Although a number of the trustees favored affiliation with the University of Delaware, its lack of enthusiasm for the proposal in time made it apparent that hope for support from that institution was not realistic. Time exerted considerable pressure because the first class was scheduled to graduate during the summer of 1975. There were several serious discussions between the law school trustees and Widener College officials in the spring of 1975. Widener had contemplated starting its own law school but preferred to acquire the Delaware Law School if it could be accredited.

In May, 1975, after a fourth inspection, the ABA recommended accreditation if the school affiliated with either Widener or the University of Delaware. The inspectors noted that although affiliation was not required, an independent Delaware Law School could not attract the broad support it required without drastic restructuring of its governing body.

At a meeting on May 24, 1975, the law school trustees decided to accept the Widener offer of affiliation. Plaintiff Plechner was not present at the meeting and Avins abstained because of his belief that as a tenured faculty member he had a conflict of interest. Throughout the spring of 1975, there had been unrest among the student body because of the delay in accreditation. The students pressed strongly for affiliation with Widener and a small minority made Plechner and Avins the objects of threats and harassment because of their reluctance to agree.

On July 12, 1975, the trustees met and amended the charter to allow issuance of one share of stock, par value of $1.00, to Widener College. At a meeting on August 6, 1975, the by-laws were amended to enlarge the Board membership to 20, giving Widener sufficient appointees to take control. The ABA granted provisional accreditation on August 12, and on August 23, 1975, the first class was graduated.

Plechner filed suit two months later incorporating many contentions but essentially seeking to set aside the affiliation and return Delaware Law School to its original status. The district court found that no undue influence or coercion had been exerted against the Board of Trustees, the issuance and transfer of stock complied with Delaware law, the trustees were not bound to follow Avins' wishes as a "founder," and Delaware Law School had suffered no losses which could be recovered in a derivative action.

Plaintiffs have raised numerous issues on appeal, and we begin by addressing their contention that they were entitled to a jury trial.

I.

JURY TRIAL

The first complaint filed by Mr. Plechner contained six counts. The latter three included assertions that there had been violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and the Civil Rights Act, 42 U.S.C. § 1983. The complaint concluded with a request that the court grant relief by:

"A. Issuing a declaratory judgment that the contract of July 8, 1975, and the issuance of stock pursuant to its resolution of August 6, 1975, is not binding on the trustees of The Delaware Law School.

B. Ordering cancellation of the stock issued to defendant Widener College.

C. Enjoining defendant Widener College from claiming any right under said contract for stock.

D. Enjoining defendant Widener College from electing any trustees of The Delaware Law School pursuant to said issuance of stock, and declaring that the prior election of trustees pursuant thereto, and all actions taken by said trustees and officers appointed by them, was invalid and of no force and effect whatsoever.

E. Awarding to plaintiff such costs, attorneys fees, and damages as may appear just to the Court."

In addition, the complaint contained the caption: "Jury Trial Demanded on Damage Counts." It is pertinent to note that violations of the Securities Exchange Act and the Civil Rights Act which entitle a party to damages are proper subjects for a jury trial.

Some months later, the Plechner complaint was amended by deleting the last three counts, which included the Securities Exchange Act and Civil Rights Act claims. The first three counts were repeated verbatim. They may be summarized as follows:

I. The transfer of the Delaware Law School through issuance of a share of stock having a par value of $1.00 when the net assets were not less than $1,000,-000 constituted a fraud under Delaware law.

II. The stock was issued in violation of Delaware law pursuant to the undue influence of ABA officials to enable Widener to assume voting control of the law school.

III. The issuance of stock by the school, a charitable corporation, after beginning its existence as a nonstock corporation was ultra vires.

The same prayer for relief set out in the first complaint was repeated verbatim. No jury trial demand was made on the amended complaint.

Two months later Avins filed his intervenor's complaint which closely tracked the three counts in the Plechner pleading. The third count included an allegation that the transfer of stock to Widener was contrary to Avins' wishes. The claims for relief were the same as Plechner's except that Avins added one more request: "A. Replevin of the stock issued to defendant Widener College and ordering its delivery to plaintiff for cancellation." Avins did not include a demand for a jury trial, although he did file such a request some weeks later.[3]

On February 18, 1976, the court directed that discovery be completed within two months, that plaintiffs file pretrial memoranda by April 19, and that trial be set for May 10. On March 29, 1976, the defendants moved to strike the plaintiffs' jury trial demands. Despite the defendant's challenge, plaintiffs did not attempt to amend their complaints or in any other pleading amplify the claims set out there. After briefs had been filed by all parties, the district court granted the motion, finding "the issues raised by the complaint as well as the relief sought to be patently equitable in nature." Avins' replevin demand, the court concluded, sounded in rescission of contract and specific restitution—not true replevin.

---

**3.** We do not accept defendant's contention that Avins' request was too late. Plechner's original complaint requested a jury trial and the case was designated as such upon the docket pursuant to Fed.R.Civ.P. 39. That designation remains unless removed through some positive action by the parties or by order of court. The amendment filed by Plechner did not expressly waive a jury trial and, accordingly, the original demand continued in effect. *See* Fed.R.Civ.P. 38(d). At the time Avins intervened in the action, a jury trial had been properly requested and he was entitled to rely on the record. He was not required to repeat the jury demand on counts which were essentially the same as those asserted by Plechner. *Collins v. Government of the Virgin Islands,* 366 F.2d 279, 282 (3d Cir. 1966). Accordingly, Avins' demand for a jury trial could not be dismissed because of untimeliness.

■ The right to a jury trial is to be determined from all the pleadings but the words or labels used there are not decisive. The court must consider the real nature of the claims and is not bound by the terminology a pleader chooses. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), 9 C. Wright & A. Miller, Federal Practice and Procedure § 2304 (1971). The prayer for relief is not controlling, but may be considered where it is relevant in determining the intent of the pleader.

Plaintiffs' complaints recited that they were proceeding as individuals as well as derivatively. They argue that because damages were requested, there was a right to a jury trial on the derivative claims and that the request for replevin of the share certificate set out a legal rather than equitable cause of action. While the plaintiffs' position is not clearly developed in the briefs or in the record, it appears that the damages they refer to are funds transferred from the law school to Widener. At trial there was evidence from which the district judge found that corporate fees had been paid by the law school to Widener for services actually rendered. Had there been any basis for reimbursement of those payments, it would have been one in the nature of restitution. In any event, the existence of such a claim was not evident from a reading of the complaints at the time the motion to strike the jury trial was filed.

■ The replevin relief mentioned in the Avins' complaint was fairly construed by the trial judge as a demand for rescission since possession of the stock certificate itself—which is what Avins would obtain under a grant of replevin—would not accomplish the result he sought. This was not a situation where actual possession of the certificate was sought by one entitled to it. In that instance, replevin can be used to gain actual possession of the paper evidencing stock ownership, but when the stock interest is sought to be affected, replevin is not the proper remedy. *Bush v. Hillman,* 22 Del.Ch. 374, 2 A.2d 133 (1938). Avins' aim was clearly directed toward the stock interest since the complaint specified that the certificate was to be delivered "for cancellation." The district court properly found that the remedy was in equity, not law.

■ Plaintiffs also argue that they sought damages as individuals. They contend that under Delaware law, compulsion is a tort and dilution of voting control in a nonprofit corporation may entitle one to damages. No convincing authority for either proposition is cited and we are not persuaded that in the circumstances of this case, legal claims were presented to the district court.

■ Additionally, at argument in this court, it appeared that the plaintiffs were claiming damages for personal harassment which occurred during the period in which affiliation was being considered. We are unable to conclude that on a fair reading the plaintiffs' complaints assert such claims.

■ Avins now contends that through discovery the defendants became aware of the harassment visited upon the plaintiffs. But even if this were so, it was not brought to the attention of the trial judge either by amendment of the complaints or filing of some other pleading after the motion to strike was filed. It is not reasonable to require a trial judge to pore through, what may in some cases be mountainous, discovery material to uncover some nugget to support a party's assertions. The burden is on the party to bring such matters to the attention of the judge and it was not met in this case.

■ Although the posture of a case may change during the course of litigation and a ruling on the jury trial issue accordingly need revision, the burden is on the party asserting the right to ask for reconsideration. It is not unusual that after a suit has commenced, a party may decide to waive his demand for a jury and proceed instead with a bench trial. A district judge is not bound to assume that a change in the circumstances in litigation automatically requires revisiting an earlier ruling on a jury demand. The plaintiffs did not renew their request nor did they at any time ask for reconsideration. Therefore, even if it be

assumed that legal claims surfaced after the jury demand had been stricken, the plaintiffs' inaction amounts to a waiver. *Cf.* Fed.R.Civ.P. 39(b).

■ The derivative claim for fraud does not assert any basis for an action at law. The thrust of the complaint is directed toward nullification of the transaction and restoration of the parties to the status quo ante. The prayer for relief requested that the issuance of stock be declared not binding and that Widener be enjoined from electing trustees or claiming any rights under the affiliation contract. Although fraud is not distinctively a legal or an equitable issue, if a claimant can be made whole only by specific relief available in equity, there is no right to a jury, 9 C. Wright & A. Miller, Federal Practice and Procedure § 2311. That is the situation here and therefore no right to a jury trial has been established.

The trial judge's ruling on the motion to strike the jury trial demand was not erroneous.

## II.

## DELAWARE CORPORATION LAW ISSUES

Plaintiffs challenge the district court's determination that the affiliation procedures were proper under Delaware corporation law. They allege that:

1. If a charitable organization begins its existence as a nonstock corporation, it may not thereafter issue stock;

2. The stock was issued for inadequate consideration; and

3. The sole, and improper, purpose of the issuance of stock was to give Widener the right to vote for new trustees.

Unlike many other states, Delaware does not have a separate code for nonprofit corporations but includes them within its General Corporation Law. There are some obvious differences between a business and a nonprofit corporation and precedents which are applicable to one may not be helpful in ruling on problems of the other. A similar caveat applies to the various code provisions because only in some instances, by referring specifically to nonprofit corporations, does the Delaware statute make it clear that a distinction is intended.

Section 102(a)(4) of the Delaware General Corporation Law, Del.Code tit. 8, in detailing the information to be included in the certificate of incorporation, provides that if a nonprofit corporation is not authorized to issue stock, a statement to that effect is to appear in the certificate. This section does not otherwise distinguish between business and nonprofit corporations, and so the requirement to describe types of stock applies to both categories. Furthermore, § 151(a) provides that "every corporation" may issue stock. Plaintiffs concede that some nonprofit corporations do issue stock, but contend that a charitable corporation does not. The Delaware Code, however, does not classify charitable corporations as distinct from other nonprofit corporations and, therefore, we must assume that there is no difference in authority to issue stock.

At the same time stock was authorized, the Delaware Law School certificate was further amended to provide that the corporation could not declare or distribute profits and on dissolution no stockholder or trustee would share in the distribution of assets but any property remaining after payment of debts would be devoted to the educational purposes of the corporation. It is unusual that a charitable corporation would issue stock which carries no rights to dividends or to share assets on dissolution. But the corporation is a creature of statute and Delaware Code § 151 gives "every corporation" the right to issue stock, making no distinction between profit and charitable entities. Existence of stock in a charitable corporation is rare, and not surprisingly, there is no Delaware decision discussing the point. However, in *Lightfoot v. Poindexter*, 199 S.W. 1152 (Tex.Civ.App.1917), a Texas court found that a stock-issuing corporation could nevertheless be treated as an eleemosynary institution.

■ Plaintiffs rely more extensively on the theory that a nonstock-issuing, nonprof-

it corporation cannot be converted into one which does have stock. But Del.Code tit. 8 § 151(g) provides that if issuance of stock is not specified in the certificate of incorporation, an amendment may authorize that step. No prohibition is directed to nonprofit corporations. The original law school charter stated that the corporation reserved the right to "restate or amend, alter, change or repeal any provision contained in its certificate of incorporation in the manner now or hereafter prescribed by law." The issuance of one share of stock by the law school in accordance with the amended certificate therefore is not contrary to the statute.

We have found no statutory prohibitions[4] or other reasons to vitiate the stock issue. It is important to note that we appraise the procedure utilized here in the light of its obvious purpose—to affiliate the law school with another educational institution for the benefit of both. Substance and intent, not mere form, are critical factors here.

The law school certificate expressly provided authority for affiliation with another educational institution. Although that could have been arranged in a variety of other ways, the trustees chose stock issuance as a simple and effective device to accomplish the desired result. That procedure had the advantage of preserving the Delaware Law School as a separate institution, yet being closely connected with Widener so that both schools could benefit from the association. There were no minority stockholders whose business interest would be affected, nor was there any distribution of property to shareholders. As the district court found, the affiliation was quite advantageous to the law school because it was through this avenue that accreditation was achieved and continued viability assured.

Adequacy of consideration and transfer of control questions in these circumstances are quite different than if a business corporation had been involved. The law school had assured its students that it would be accredited. Relying on those representations, the students invested heavily in time and money. It is most unlikely that the school could have continued to exist without the approval of the ABA. The bitter reaction from students who had been denied the benefits of graduation from an accredited institution would have been a handicap to the law school which it probably could not have overcome. Affiliation with Widener was an essential step in fulfilling the school's pledge to the law students and securing their support in later years.

It is true the one dollar price of the stock did not represent the full value of the assets of the law school and if a business corporation were involved, serious questions would arise. But a charitable corporation cannot confer any financial benefit on its members or governing body and stock in this circumstance represents ownership only for the limited purposes provided by the charter. In a profit corporation context, adequacy of consideration has definite and measurable meaning. In an affiliation of charitable organizations, it does not. Here, Widener in effect received the assets of the law school, but subject to the very real obligation to use them in carrying out its mission. The assumption of that duty was consideration in a very practical sense. With these unusual factors present, the district court did not err in declining to find inadequacy of consideration.

Although strict compliance with the statute does not end the inquiry into the propriety of affiliation, *Singer v. Magnavox Co.*, 380 A.2d 969, at 975–80 (Del. Sept. 23, 1977), we are convinced that the change in control was lawful. In a profit corporation setting, maneuvers to change control may be found to lack proper business purpose and thus not be permissible. Here, however, the purpose of shifting control was based on necessity and the best interests of the law school. The intent was not to benefit the trustees but the students, present and future, who were the objects of the

---

4. Section 257 of the Delaware Code allows the merger of one nonprofit corporation with another but does not authorize the merger of a charitable nonstock corporation into a stock corporation if the charitable corporation status as such would be impaired.

school's charitable aims. In these unique circumstances, we cannot say that the issuance of the stock was ultra vires. The action was taken for a lawful and necessary purpose, for adequate consideration and in furtherance of the charter's authorization to affiliate.

The same general considerations apply to Avins' claim that the trustees were bound to respect his wishes as "founder." He relies on a number of English cases dealing with colleges which we find inapplicable since the law school existed under and by virtue of a Delaware statute, not common law.[5] Although Avins was the incorporator, the power to govern the institution passed to the trustees upon their election. Article VII of the certificate provides: "Upon the filing of this certificate with the Secretary of State, the incorporator's powers shall terminate and the powers of the corporation shall immediately vest in a board of trustees as the governing body of this corporation. . . ." The certificate contained no provision for control of the school's activities by Avins or granting him veto power if his wishes were not respected. It is undeniable that Avins conferred considerable benefit upon the school. He, however, is not in the same position as the settlor of a charitable trust and did not contribute a fund as such whose employment could be restricted to ends desired by a settlor. Although "sweat equity" has been utilized in some governmental housing programs, it has not yet been recognized as equivalent to the corpus of a charitable trust.

Nor is the doctrine of cy pres applicable. Avins did not establish a trust for limited purposes which could not be carried out. The affiliation of the school in due course with another institution was antici-

pated by the certificate of incorporation and consequently there was no need for the Board to consult a court of equity for permission to do that which had been authorized by the certificate.

## III.

### ALLEGED DURESS AND COMPULSION

Plaintiffs alleged that there was undue duress exerted on the trustees and their agreement to affiliate with Widener was the result of compulsion. Restatement of Contracts §§ 492 and 493, upon which plaintiffs relied, require essentially that one asserting duress must establish a wrongful act or threat which prevented a party from exercising his free will and judgment. This is primarily a question of fact which was resolved adversely to the plaintiffs by the district court. The trustee witnesses denied that they were coerced into voting for affiliation. The Board included a common pleas judge, a knowledgeable bank officer, a state senator, and several practicing lawyers. As the trial judge observed, each of the trustees was experienced in making difficult and important decisions under pressure. Their votes to affiliate the law school were based on their understanding of what was necessary in the best interests of the school and not on fear. Threats and harassments directed against the plaintiffs themselves are not relevant since neither voted for affiliation.

We find no error in the district court's resolution of this issue.

## IV.

### DISMISSAL OF THE AMERICAN BAR ASSOCIATION

The American Bar Association is an unincorporated association, having mem-

---

5. Among the English cases which plaintiffs cite are *Philips v. Bury*, 90 Eng.Rep. 1294 (K.B. 1694); *A. G. v. Sherborne Grammar School*, 52 Eng.Rep. 101 (Ch. 1854); and *A. G. v. Dedham School*, 53 Eng.Rep. 138 (Ch. 1857). None of these authorities support the proposition that the wishes of a college founder must be respected merely because they are his current desires. Rather, the opinions interpret the original formal instruments to determine the intent of the founder in creating the institu-

tions. Here, the document used to create the law school was the certificate of incorporation which vests governing power in the Board of Trustees, not the founder.

Plaintiffs also cite cases from Ireland, Nova Scotia, and several American jurisdictions other than Delaware. We believe, however, that the answer lies closer to home. Having chosen to establish the law school as a Delaware corporation, Avins, as incorporator, is bound by Delaware statutory law.

bers in each of the fifty states, with its headquarters in Chicago, Illinois. Jurisdiction in this case, as pleaded in the amended complaint, was founded only upon diversity of citizenship, 28 U.S.C. § 1332. In *United Steelworkers of America v. R. H. Bouligny*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965), the Supreme Court held that an unincorporated association's citizenship is that of each of its members. Plaintiff Plechner is a citizen of New Jersey, and there are many members of the American Bar Association who are citizens of that state. Diversity, therefore, was lacking, and the district court properly dismissed the American Bar Association from the case. *See Seyler v. Steuben Motors, Inc.*, 462 F.2d 181 (3d Cir. 1972), C. Wright, Law of Federal Courts §§ 24, 27 (1976).

## V.

## DISQUALIFICATION OF THE TRIAL JUDGE

During one of the pretrial hearings, the trial judge noted that he was a member of the American Bar Association and had been for many years. Counsel for Widener noted that plaintiff Plechner was also a member. The court then stated: "Does anybody have any comment or request based upon my membership in the ABA?" There was no response by anyone and no motion for recusal was ever filed in the district court.

Plaintiffs now allege that the district judge was disqualified under 28 U.S.C. § 455(b)(4) as having a "financial interest . . . in a party to the proceeding" and under § 455(b)(1) as having "personal knowledge of disputed evidentiary facts."

Section 455 was amended in 1974 to clarify the circumstances in which a federal judge should be disqualified. The amendment followed soon after the ABA formulated a Code of Judicial Conduct which the Judicial Conference of the United States adopted in all but minor details. *See* [1974] U.S.Code Cong. & Admin.News, 6351; C. Wright & A. Miller, Federal Practice and Procedure § 3541. 28 U.S.C. § 455(b)(4) states that a judge shall disqualify himself when he has a financial interest in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the case. "Financial interest" is defined in subsection (d)(4) as "ownership of a legal or equitable interest, however small," but does not include certain remote interests. The statute further specifies that ownership of shares in a mutual fund is not a "financial interest" in securities owned by the fund; an office in a fraternal, charitable or civic organization is not a disqualifying interest in securities held by the organization; nor is the proprietary interest of a policyholder in a mutual insurance company, mutual savings association or the ownership of government securities, unless the outcome of the case could substantially affect the value of the interest. *See* § 455(d)(4)(i)–(iv).

In their brief, as support for their position, plaintiffs cite 7 C.J.S. *Associations* § 27 stating that a member of an unincorporated association owns an undivided joint interest in its property. Although that proposition may have validity in some circumstances, it does not apply to the American Bar Association. Article 32.1 of the Association's Constitution and By-Laws states: "The interest of a member in the property of the Association is limited to its use for association purposes." Section 32.2 reads: "If the Association is dissolved, all its property not needed for the payment of its debts and expenses shall be transferred or conveyed to one or more organizations as engaged in activities related to the legal profession and that qualify for exemption under § 501(c)(3) of the Internal Revenue Code of 1954 (or similar statutes hereinafter enacted). The Board of Governors shall select the organizations to which such transfer or conveyance is made and shall determine how the property is apportioned between them. In the absence of such selection or determination by the Board, it may be made by a court of competent jurisdiction." Thus, a member does not have a joint interest in property of the Association but only has the opportunity to use it for Association purposes.

Plaintiffs also argue that a member may be held liable for torts committed by association agents. But there is not the slightest reference in this record to show that the district judge had even the most fleeting connection with any of the events underlying the case. There is no basis for an inference of potential liability on the part of the trial judge and it is significant that the plaintiffs do not explicitly make such a claim.

In a diversity action, the amenability of an unincorporated association to suit is governed by the law of the state in which the court sits. *Underwood v. Maloney*, 256 F.2d 334 (3d Cir. 1957), *cert. denied*, 358 U.S. 864, 79 S.Ct. 93, 3 L.Ed.2d 97 (1958); *See* Fed.R. Civ.P. 17(b). Pennsylvania, the forum state, allows suit to be brought against an unincorporated association either in its own name or that of an officer as trustee ad litem. Pa.R.Civ.P. 2153. A judgment entered against an association alone will support execution upon its property but not that of an individual member. Pa.R.Civ.P. 2158. 6 Goodrich-Amram 2d, Standard Pennsylvania Practice § 2158.1 (1977). Those who wish to pursue assets of an individual member of an association, should join him as a named defendant. The existence of this remedy for a serious claimant is a circumstance to be weighed in evaluating the plaintiffs' vague suggestions of an am-bient potential liability on the part of the trial judge.

Also pertinent is the fact that the American Bar Association numbers more than 200,000 members. Even in the absence of any information as to the existence of liability insurance, or the extent of available association funds, it is apparent that the exposure of an individual member for damages in this case would be insignificant. The potential for liability falls in the same category as that of a depositor in a mutual savings bank where there is a disqualifying interest only if it can be shown that the case will have a substantial effect on the interest.[6] There is none here. The Court of Appeals for the Fifth Circuit has concluded that bar association membership does not disqualify a judge in circumstances far stronger in favor of recusal than those here. *Parrish v. Board of Commissioners of the Alabama State Bar*, 524 F.2d 98 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). *See also Pilla v. American Bar Association*, 542 F.2d 56 (8th Cir. 1976).[7]

We conclude that membership in the American Bar Association is not a financial interest which requires that a judge disqualify himself where the ABA is a party.

Plaintiffs allege also that the trial judge was disqualified under § 455(b)(1) because

---

6. The substantial effect test is appropriate because the association is not a business corporation, but a nonprofit organization concerned with improvement of the legal profession and the public good. The considerations which led to the statutory test of possession of an interest, no matter how small, in a profit corporation are not present here and we think it inappropriate to use that test.

7. All of the members of this court are members of the American Bar Association and were requested to disqualify themselves by plaintiffs on this appeal. With the consent of the parties, the question was referred to the Advisory Committee on Judicial Activities of the Judicial Conference of the United States.

The Committee concluded that a judge's membership in the American Bar Association did not constitute a "financial interest" in the Association. The Committee cited W. Thode, Reporter's Notes to Code of Judicial Conduct, 66–70 (1973), to the effect that the definition of " 'financial interest' . . . is part of a carefully constructed, cohesive system that sets standards for disqualification of a judge for economic interest . . . . Not all of a judge's economic interests are defined as 'financial' . . . . . The 'financial interest' of a judge that will disqualify him is his direct legal or equitable ownership interest, no matter how small, in a party or in a subject matter in a proceeding before him."

The Committee's report was based on Canon 3C of the Code of Judicial Conduct since it could not properly pass upon application of 28 U.S.C. § 455(b) and (d). After receiving the report, this court denied the plaintiffs' motions for disqualification. Two of the active judges and one of the senior judges of the court have recused for reasons other than their status as members of the ABA.

he had "personal knowledge of disputed evidentiary facts." They assert that the trial judge knew Judge John B. Hannum of the District Court for the Eastern District of Pennsylvania and witness Mitchell Miller, a member of the Philadelphia bar and, therefore, should not have heard the case. Those allegations, however, do not establish knowledge of evidentiary facts and are not within the scope of § 455(b)(1). Nor is § 455(a) applicable.

Judge Hannum was (and is) a trustee of Widener College, but was not called to testify at the trial. The trial judge, therefore, was not required to pass upon Judge Hannum's credibility. Moreover, in the circumstances of this case, if the plaintiffs objected to judges of the Eastern District sitting in the case because of Judge Hannum's association with Widener, a request should have been made to the Chief Judge to secure the assignment of a judge from another district. Plaintiffs chose to do nothing, apparently preferring to await the outcome of the case before voicing any objection. Such belated action is contrary to the orderly administration of the courts and substantially undercuts plaintiffs' position.

The trial judge's acquaintanceship with witness Miller was neither unusual nor disqualifying. It is to be expected that before he ascends the bench, a district judge will have had contacts with other members of his bar in the normal practice of law. That, however, does not prevent the judge from fairly passing on the strength of a lawyer's testimony should he be called as a witness. The disqualification provision is directed toward knowledge of disputed evidentiary facts, that is, matters underlying the cause of action. We do not understand the statutory language to be directed toward routine judgments of credibility. Such an interpretation would require all the judges in many districts to be disqualified in the most pedestrian of cases if they had some previous contact with a witness. Congress did not intend to disrupt the court's business on such inadequate grounds.

In some circumstances, it is possible that a judge's relationship with a crucial witness might be such that his impartiality might reasonably be questioned, and thus be a ground for disqualification under § 455(a). That is not the situation here. Plaintiffs have not made that contention, nor do we perceive any basis for it. *See Parrish v. Board of Commissioners of the Alabama State Bar, supra.*

Accordingly, we hold that the trial judge was not disqualified.

## VI.

### DISCOVERY RULING

At a pretrial conference in February, 1976, the trial judge ordered that the parties conclude discovery within two months. Plaintiffs contend that the time was so short as to amount to an abuse of discretion. We are unable to accept their position. The suit was filed in October, 1975 and there were more than six months before trial to complete discovery. Even after Avins intervened, there was adequate time for reasonable discovery. The factual matters in this case were comparatively simple and the time allotted for discovery was sufficient.

We have reviewed the many contentions set out in the plaintiffs' briefs with care. We conclude that the trial judge correctly analyzed the issues in this case and entered a proper judgment on the merits. Accordingly, the action of the district court will be affirmed.