# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-1648, 03-1665, 03-1669

WILLIAMS ELECTRONICS GAMES, INC. *et al.*,

*Plaintiffs-Appellants,*

*v.*

JAMES M. GARRITY *et al.*,

*Defendants-Appellees.*

MILGRAY ELECTRONICS, INC.,

*Defendant/Counter-Plaintiff/*
*Cross-Plaintiff/Cross-Appellant,*

*v.*

WILLIAMS ELECTRONICS GAMES, INC.,

*Plaintiff/Counter-Defendant/*
*Cross-Appellee,*

and

LAWRENCE J. GNAT and RICHARD S. SLUPIK,

*Defendants/Cross-Defendants/*
*Cross-Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 97 C 3743—**Robert W. Gettleman**, *Judge.*

_____

ARGUED FEBRUARY 24, 2004—DECIDED APRIL 29, 2004
_____

Before POSNER, RIPPLE, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.    Williams, the manufacturer of *Mortal Kombat* and other video games, brought suit for fraud and related misconduct, federal and state (Illinois law governs the state law claims), against two of its components suppliers, Arrow and Milgray. (National Union, Williams's insurer, joined as a plaintiff, but need not be discussed separately.) Williams charges the suppliers with, among other things, having bribed one of its buyers, Greg Barry, to buy from them. Williams also named as a defendant James Garrity, a salesman for Arrow. Milgray counterclaimed. It charged that Williams had conspired with two of Milgray's employees, Gnat and Slupik (against whom Milgray filed cross-claims), to defraud Milgray by purchasing components from a company named Microcomp that Gnat and Slupik had created and were operating in violation of their duty to their employer.

The jury rendered a verdict for Williams against Garrity for $78,000 but exonerated the other defendants. The judge then rejected Williams's equitable claims. Williams appeals—as does Milgray, because the judge rejected its claims against Williams, Gnat, and Slupik. We'll discuss Williams's claims first.

Barry received more than $100,000 in cash bribes from Arrow and Milgray over a four-year period during which these two suppliers sold Williams some $100 million in component parts. Eventually Williams discovered Barry's bribe-taking and fired him. The company may have been careless in failing to discover the bribes sooner; it may even have known about the bribes but not cared because it thought it was getting a good price and excellent service

from Arrow and Milgray. That is a matter of fierce dispute but Williams does admit being aware that some of its suppliers, not limited to Arrow and Milgray, were giving gift certificates ranging from $25 to $500 to its employees at Christmas time. Williams had no policy against its employees' accepting Christmas gifts, provided that any gift in excess of $100 was disclosed to and approved by a company audit board, except that buyers (such as Barry) were forbidden to accept any gift, period. The cash bribes received by Barry were not considered by either donor or recipient to be Christmas gifts.

Commercial bribery is a garden variety of fraud, e.g., *Ash v. Wallenmeyer*, 879 F.2d 272, 273 (1989), appeal after remand, *Ash v. Georgia-Pacific Corp.*, 957 F.2d 432 (7th Cir. 1992); see *Ginsburg v. United States*, 909 F.2d 982, 989-91 (7th Cir. 1990); *Walker v. Marshall Field & Co.*, 179 Ill. App. 3 (1913), here consisting of the suppliers' concealing from Williams the fact that they were bribing its buyer. The judge gave a standard fraud instruction. It required the jury to find that Williams had justifiably relied on the facts known to it in continuing to purchase from Arrow and Milgray—or in other words that Williams hadn't known about the bribes. At the request of the defendants, however, the judge also gave instructions on the affirmative defenses of ratification and *in pari delicto*. He instructed the jury that if Williams had known or "should have known" of the defendants' bribing Barry, it should find that Williams had ratified the fraud and could not recover damages. And likewise if Williams had been *in pari delicto* (equally at fault) with the defendants, which it would be, the judge told the jury, if Williams either (1) "was aware of a general practice of bribery of its buyers by its suppliers" or (2) "knew or was recklessly indifferent to the fact that Greg Barry was soliciting and/or accepting kickbacks from Williams' vendors." The jury found that Williams had proved fraud, in accordance with the instruction on fraud, but also found

that the corporate defendants (Garrity did not assert these defenses) had proved both affirmative defenses; and so Arrow and Milgray were exonerated.

The instructions on the affirmative defenses were erroneous at a quite fundamental level. As countless cases affirm, a victim's negligence is not a defense to an intentional tort, such as fraud. *Chapman v. Hosek*, 475 N.E.2d 593, 599 (Ill. App. 1985); *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 537 (7th Cir. 2003); *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 625 (7th Cir. 2000); *In re Mercer*, 246 F.3d 391, 421 (5th Cir. 2001). (For that matter, it is no longer a complete defense to an unintentional tort, having been replaced by the partial defense of comparative negligence. E.g., *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 847 (7th Cir. 1999); *Alvis v. Ribar*, 421 N.E.2d 886, 896-97 (Ill. 1981). That should have been a clue as to how the law would treat the victim's negligence in the setting of an intentional tort.) Yet by instructing the jury that it should return a verdict for the defendants if it found that Williams "should have known" that Barry was taking bribes, the judge allowed the jury to exonerate the defendants on the basis of the carelessness of their victim in failing to discover that it *was* a victim.

The error was compounded by a misunderstanding of the legal meaning of ratification. Had Williams after discovering Barry's bribe-taking decided that it was on the whole beneficial to Williams (maybe because it allowed Williams to pay him a lower salary!), and had decided not to fire him or otherwise discipline him, that would be ratification, much as if a restaurant owner decided after discovering that his headwaiter was accepting tips in order to seat patrons to condone the practice (still common, especially in nightclubs). Cf. *State v. Brewer*, 129 S.E.2d 262, 276 (N.C. 1963). Or as if Barry, as Williams's agent, had made an unauthorized transaction on Williams's behalf that Williams, after discovering the transaction, had decided was in its interest after

all, and so it would retain the benefits of it. E.g., *Eastern Trading Co. v. Refco, Inc.*, *supra*, 229 F.3d at 625; *Hurd v. Wildman, Harrold, Allen and Dixon*, 707 N.E.2d 609, 616 (Ill. App. 1999); *Progress Printing Corp. v. Jane Byrne Political Committee*, 601 N.E.2d 1055, 1067-68 (Ill. App. 1992). Obviously it couldn't retain the profits of the transaction but shuck off the costs on the ground that it had never authorized the transaction and therefore wasn't bound by it. See *Extra Equipamentos e Exportação Ltda. v. Case Corp.*, 361 F.3d 359, 360 (7th Cir. 2004).

But that isn't the defendants' theory. It is that Williams knew all along about Barry's bribe-taking. If so, this would exonerate the defendants, all right, because it would mean there had been no fraud in the first place, not that the fraud had been washed away by ratification. No ratification instruction should have been given, let alone one that misstated the law by supposing that ratification can be premised on a careless accident.

The defense of *in pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim, *Pinter v. Dahl*, 486 U.S. 622, 636 (1988); *Crawford v. Colby Broadcasting Corp.*, 387 F.2d 796, 798 (7th Cir. 1967), as in the classic case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together. Note, "The Highwayman's Case," 9 *L.Q. Rev.* 197, 197-99 (1893) (*Everet v. Williams* (Ex. 1725)); *Byron v. Clay*, 867 F.2d 1049, 1051-52 (7th Cir. 1989); see also *Cisna v. Sheibley*, 88 Ill. App. 385 (1899). It has been extended to the case—illustrated not by the *in pari delicto* defense asserted by Arrow and Milgray but by the separate *in pari delicto* defense asserted by Milgray—in which each party is accused of having wronged the other; Milgray, as we'll see, claims that Williams committed fraud against it at the same time that it was committing fraud against Williams.

That is not the character of the *in pari delicto* defense that Arrow and Milgray asserted jointly against Williams. Clause (2) of the instruction ("knew or was recklessly indifferent to the fact that Greg Barry was soliciting and/or accepting kickbacks from Williams' vendors") barred Williams from recovering against either defendant if the jury found that Williams knew that, or was recklessly indifferent to whether, Barry was taking bribes. This part of the instruction didn't define a defense distinct from ratification, but merely repeated in different words the instruction on ratification, except that for negligence it properly substituted reckless indifference, which the law treats for most purposes including this one the same as knowledge. E.g., *Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 645 (7th Cir. 2002); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041-42 (7th Cir. 1990). Clause (1) ("was aware of a general practice of bribery of its buyers by its suppliers") likewise repeated the defense of ratification in the guise of *in pari delicto* (as if it helps a jury to have instructions translated into Latin!), but reinjected negligence as a basis for barring Williams by suggesting that Williams's knowledge of a "general practice," presumably a reference to the Christmas gifts, should have alerted it to the possibility that Barry was taking big bribes.

Apart from the fact that the two affirmative-defense instructions were at once erroneous and confusingly overlapping, they made a confusing mish-mash with the instruction on prima facie fraud. The jury found that Williams had been justified in relying on the facts known to it, yet how could it find that and at the same time find that Williams both had ratified the fraud and had been equally at fault with the defendants? There is a possible path, as we're about to see, but we can have no confidence that it is the one the jury actually took.

So Williams is entitled to a new trial on fraud—but not, as it urges, to a judgment based on the jury's finding of prima facie fraud. The jury *may* have based its findings of ratification and equal fault simply on negligence by Williams—the instructions would have permitted that—in which event Williams would be entitled to a judgment. But, again given the confusing medley of instructions, we cannot have any confidence that that was the jury's thought process.

The separate *in pari delicto* instruction that the judge gave with respect to Milgray's claim against Williams and its former employees required the jury to bring in a verdict for Milgray if it found (as it did) that "Williams, acting through its agent Barry, knowingly participated in Slupik's and/or Gnat's unlawful diversion of business from Milgray to Microcomp." (Remember that Gnat and Slupik were employees of Milgray who formed a company that sold components to Williams in competition with Milgray.) This instruction did not commit the error of injecting the issue of the victim's negligence into an intentional-tort case, but it had no basis in law, because it required no showing that Williams benefited from, or even knew anything about, Gnat's and Slupik's conduct. All the instruction required the jury to find was that Williams was "acting through its agent Barry," which we take to mean, and which the jury probably understood to mean as well, nothing more than that Barry was Williams's agent.

Barry doubtless harmed Milgray by buying from Microcomp, and Milgray could sue him for that harm. But the fact that Barry was bribed not only by Milgray, to Milgray's benefit, but also by two employees of Milgray, to Milgray's detriment, does not establish fault on the part of Williams. An agent's knowledge is not imputed to his principal when the agent is acting adversely to the principal, *Ash v. Georgia-Pacific Corp., supra*, 957 F.2d at 436; *Lease*

*Resolution Corp. v. Larney*, 719 N.E.2d 165, 170 (Ill. App. 1999), as Barry was. "[I]n general when an agent acts *entirely* on his own behalf, doing things that could not possibly be interpreted as the merely overzealous or ill-judged performance of his duties as agent, he is acting outside the scope of the agency and the principal is not bound." *Hartmann v. Prudential Ins. Co. of America*, 9 F.3d 1207, 1210 (7th Cir. 1993) (emphasis in original). It is not as if Gnat's and Slupik's fraud benefited Williams; it just made Milgray another victim, along with Williams itself, of Barry's fraud. It did not make Williams equally at fault with Barry. *Lawyers Title Ins. Corp v. Dearborn Title Corp.*, 118 F.3d 1157, 1164 (7th Cir. 1997). The instruction was an example of blaming the victim, with a vengeance.

Williams might be liable to Milgray under one theory or another, but it was not a participant in the fraud against Milgray, especially when we consider that, so far as appears, Williams lost, and Milgray on balance benefited, from Barry's conduct. The only fault of Williams mentioned by the instruction is Barry's bribe-taking; the jury was not asked to find that Williams authorized or ratified Barry's conduct or even that it was negligent in failing to prevent it.

The defendants argue that if we reverse the judgment in their favor, damages should be capped at $78,000, the amount of the verdict against Garrity, the Arrow salesman who bribed Barry on Arrow's behalf. It happens that that was the amount of the bribes that Garrity paid. But it corresponds neither to the damages that Williams may have sustained as a result of Garrity's bribing Barry (and remember that Milgray as well as Arrow bribed him) nor to the profits that the defendants may have made from the bribery by overcharging Williams, though the bribes might as we'll see be a lower-bound estimate of the damages that Arrow, Garrity's employer—and Arrow alone—inflicted on

Williams. The $78,000 figure is a token of the jury's confusion and an unreliable guide to either Williams's total loss or the defendants' gain.

We have mentioned the defendants' gain as well as Williams's loss because in addition to seeking damages for the fraud perpetrated upon it, Williams asked the judge to impose a constructive trust in its favor on the profits that the defendants had made from their bribery. The victim of commercial bribery, who usually as here is the principal of an agent who was bribed, can obtain by way of remedy either the damages that he has sustained (the damages remedy) or the profits that the bribe yielded (the restitution or unjust enrichment remedy). 2 Dan B. Dobbs, *Dobbs Law of Remedies, Damages-Equity-Restitution* § 10.6, p. 698 (2d ed. 1993). The total profits would consist of the bribe itself (received by Barry, of course, not by Garrity or Arrow), plus the revenue that the bribe generated for the briber, minus the cost of goods sold and any other variable costs incurred in making the sales that generated that revenue. See *Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085, 1096-97 (Ill. App. 1991); *Taylor v. Meirick*, 712 F.2d 1112, 1120-22 (7th Cir. 1983).

Commercial bribery is a deliberate tort, and one way to deter it is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act. *Id.* at 1120. The amount of the bribe paid is of course not a profit to the briber, but an expense, and it should not enter into the net profit calculation sketched above. It can be used as a minimum estimate of damages, however, on the theory that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is, at least as a first approximation, an additional

expense to the person whose agent was bribed. *Continental Management, Inc. v. United States*, 527 F.2d 613, 619 (Ct. Cl. 1975); *Donemar, Inc. v. Molloy*, 169 N.E. 610, 611 (N.Y. 1930). Arrow presumably jacked up its prices to Williams by at least $78,000 to cover the cost of the bribes that it was paying Barry to swing business its way, as otherwise it would have lost rather than made money from bribing him. The implication is that had it not been for the bribes, Arrow's prices to Williams would have been at least $78,000 lower. So that amount is a minimum estimate of the loss to Williams caused by Arrow's bribing Barry.

Restitution is available in any intentional-tort case in which the tortfeasor has made a profit that exceeds the victim's damages (if the damages exceed the profit, the plaintiff will prefer to seek damages instead), whether or not the tort involved a breach of fiduciary duty, *Roberts v. Sears, Roebuck & Co.*, 617 F.2d 460, 464 (7th Cir. 1980) (fraud); *Cross v. Berg Lumber Co.*, 7 P.3d 922, 932-36 (Wyo. 2000); Douglas Laycock, "The Scope and Significance of Restitution," 67 *Tex. L. Rev.* 1277, 1286 (1989), though commercial bribery normally will involve such a breach. The only thing that turns on the precise character of the defendant's wrongdoing is, in some cases, the availability of equitable as distinct from legal restitution. Just as damages can be obtained either in a suit at law, or, in an equity suit, under the "clean up" doctrine, *May Dept. Stores Co. v. Federal Ins. Co.*, 305 F.3d 597, 603 (7th Cir. 2002); *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442 (7th Cir. 1984); *Vowell v. Fairfield Bay Community Club, Inc.*, 58 S.W.3d 324, 328 (Ark. 2001); *Clark v. Teeven Holding Co.*, 625 A.2d 869, 881 (Del. Ch. 1992), or by the imposition of a constructive trust on moneys wrongfully withheld from the plaintiff, *May Dept. Stores Co. v. Federal Ins. Co., supra*, 305 F.3d at 603; *Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Wells*, 213 F.3d 398, 400-01 (7th Cir. 2000), or by surcharging a trustee for the losses

that he has caused to the trust, *Restatement (Second) of Trusts* § 205(a) (1959); John H. Langbein, "What ERISA Means by 'Equitable': The Supreme Court's Trail of Error in *Russell*, *Mertens*, and *Great-West*," 103 *Colum. L. Rev.* 1317, 1335-38 (2003), so restitution, too, can be awarded in either a suit at law or a suit in equity. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002); *SEC v. Lipson*, 278 F.3d 656, 663 (7th Cir. 2002); *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 710 (7th Cir. 1999); *Reich v. Continental Casualty Co.*, 33 F.3d 754, 756 (7th Cir. 1994). If as in this case the wrong consists of a breach of fiduciary obligation—the kind of breach traditionally actionable in suits in equity (fiduciary obligations were an invention of the English chancery court, *In re Estate of Karmey*, 658 N.W.2d 796, 799 n. 3 (Mich. 2003) (per curiam); *Beckman v. Farmer*, 579 A.2d 618, 651 n. 42 (D.C. 1990); 3 Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 197 (4th ed. 1988))—the usual form that restitution takes is to impress a constructive trust on the profits of wrongdoing, with the defendant the trustee and the plaintiff, of course, the beneficiary. *Health Cost Controls of Illinois, Inc. v. Washington*, *supra*, 187 F.3d at 710-11; *Chicago Park District v. Kenroy, Inc.*, 402 N.E.2d 181, 186 (Ill. 1980); *Village of Wheeling v. Stavros*, 411 N.E.2d 1067, 1069-70 (Ill. App. 1980).

But if all that the plaintiff is seeking is a sum of money equal to the defendant's profit, an order of restitution will do fine, *Great-West Life & Annuity Ins. Co. v. Knudson*, *supra*, 534 U.S. at 212-14, and the device of a constructive trust is surplus; the device comes into its own only when the plaintiff is seeking title to specific property in the defendant's hands. Which means, by the way, that the imposition of a constructive trust can be sought as an equitable remedy for a legal as well as an equitable wrong (on both points see *Health Cost Controls of Illinois, Inc. v. Washington*, *supra*, 187

F.3d at 710-11; also *Frederickson v. Blumenthal*, 648 N.E.2d 1060, 1061-62 (Ill. App. 1995)), just as, in a suit for damages for breach of contract, the court can order an equitable accounting if the computation of damages involves complexities that would baffle a jury. *Kirby v. Lake Shore & Michigan Southern R.R.*, 120 U.S. 130, 134 (1887). For completeness, we note that when restitution is sought in a law case and the plaintiff is not seeking to impress a lien on particular property, but just wants an award of profits, he cannot obtain a constructive trust, because there is no *res* (that is, no fund or other specific piece of property) for the trust to attach to. *Great-West Life & Annuity Ins. Co. v. Knudson*, *supra*, 534 U.S. at 212-14; *People ex rel. Hartigan v. Candy Club*, 501 N.E.2d 188, 191 (Ill. App. 1986); 2 Dobbs, *supra*, § 6.1(3). He can still get restitution in such a case, but as a legal remedy for a legal wrong, not as an equitable remedy for a legal or an equitable wrong.

Williams's situation was in between. It was not seeking to impose a lien on particular property, so it had no basis for seeking a constructive trust. But the wrong for which it was seeking a remedy (properly described as restitution, or, what is synonymous as a practical matter, an accounting for profits, *Great-West Life & Annuity Ins. Co. v. Knudson*, *supra*, 534 U.S. at 213 n. 2; *People ex rel. Hartigan v. Candy Club*, *supra*, 501 N.E.2d at 190; 1 Dobbs, *supra*, § 4.3(1), rather than as the imposition of a constructive trust) was an equitable wrong, a breach of fiduciary obligation, and so Williams was entitled to seek equitable restitution. And therefore it could seek (legal) damages from a jury and then, if it thought it could obtain a larger recovery by way of restitution, an order of restitution from the judge, since equitable remedies are determined by judges rather than by juries. *Hill v. Names & Addresses, Inc.*, *supra*, 571 N.E.2d at 1095-96; *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 228-30 (7th Cir. 1993). Of course it could not keep

both damages and profits, only the larger of the two. And of course when an equitable remedy is sought in conjunction with a legal remedy the legal claim is tried first and the jury's findings bind the judge, in order to vindicate the right to a jury trial on legal claims. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479 (1962); *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 559 (7th Cir. 1992).

The jury having exonerated the defendants, the judge refused to order equitable relief; but since we are setting aside the jury's verdict, the judge's ruling on equitable relief falls with it. Again for completeness, we note that since restitution is a legal as well as an equitable remedy, Williams could have sought such relief from the jury. No one doubts that Williams was entitled to have a jury try its claim of fraud; despite the equitable origins of remedies for fraud a suit complaining of fraud is treated as a case at law if a legal rather than an equitable remedy is sought, *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 143-47 (2d Cir. 1999); *Skippy, Inc. v. CPC Int'l Inc.*, 674 F.2d 209, 214 (4th Cir. 1982); *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1258 (3d Cir. 1977); *Hyde Properties v. McCoy*, 507 F.2d 301, 305 (6th Cir. 1974); 8 James Wm. Moore, *Moore's Federal Practice* § 38.30[1][e] (3d ed. 2003), and since restitution is equally a legal and an equitable remedy, it can be sought from a jury in a fraud case.

We turn now to Williams's statutory claims, all of which the judge threw out. One was that Arrow and Milgray had conspired to fix the prices they charged Williams, in violation of section 1 of the Sherman Act. They *might* have gotten together, agreed not to give volume discounts to Williams (Williams was a very good customer, and might have been expected to receive such discounts), and agreed to bribe Barry not to demand any discounts from them. And then there might be a good Sherman Act claim. But there is

no evidence of concerted action by the two suppliers. The fact that both may have charged higher prices than they would have done had they not been bribing Barry does not show that they agreed on those prices, or for that matter agreed to bribe Barry. For even if both suppliers agreed with him separately to pay the bribes, one would expect the prices of both to rise, since otherwise the suppliers wouldn't both be profiting from the bribes. But the common price increase would not in that case be the result of collusion, and commercial bribery that does not involve any collusion between competitors does not violate the Sherman Act's prohibition against price-fixing. E.g., *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1279-85 (7th Cir. 1983); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 687-88 (9th Cir. 1976); compare *DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1196-1201 (11th Cir. 1993).

Another nonstarter is Williams's RICO claim, which alleges an "enterprise" consisting of Arrow, Milgray, and Barry. How could that be an enterprise? If briber and bribed constitute, solely by virtue of that unlovely relation, a RICO enterprise, then any time one person bribes another both have violated RICO. We cannot see the sense of that. It is true that bribery is one of the offenses upon which a RICO claim can be based, 18 U.S.C. § 1961(1); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 527-28 (3d Cir. 1998), but the bribe itself is not the RICO offense; it is the predicate act of the RICO enterprise and, as in *Ash v. Wallenmeyer*, *supra*, 879 F.2d at 275-76, there is no enterprise here. Cf. *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930 (7th Cir. 1999).

Williams's last statutory claim is under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* The judge rejected the claim on the

ground that Williams is not a consumer. Actually, it is a consumer as defined in the Act, if the Act is read literally, because it purchased components from Arrow and Milgray not for resale but instead for use in manufacturing its video games, which are products that it sells, not resells. "The term 'consumer' means any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). However, we rejected the literal reading in *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1039-40 (7th Cir. 1989), lest the Act so read "supplant many common law breach of contract and fraud cases, something the Illinois legislature surely did not intend." *Id.* at 1039. In the non-literal reading adopted by that case, the business purchaser is not a consumer, because his only use of the purchased product is as an input into the making of a product that he sells, in contrast to the individual who consumes a six-pack of beer for pleasure or nutrition rather than incorporating the beer into a product (his beer belly is not for sale).

In any event the section under which Williams sued does not protect just consumers, but any person. 815 ILCS 505/10a(a); see also 10a(c). The courts have, it is true, glossed this provision to require that the fraud be of sufficient magnitude to be likely to affect the market generally, *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217 (Ill. App. 2003); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999), and thus be likely to harm consumers in the colloquial sense of the ultimate buyer of the finished product, or in this case the patrons of the game arcades in which the video games manufactured by Williams are played. But that requirement is satisfied. The fraud must have added something, and maybe a lot, to Williams's input costs, and given Williams's position in the video game market some part of the increase would undoubtedly have

been passed on to consumers in the form of higher prices. Passing on is impossible if a seller faces a horizontal demand curve, meaning that the slightest increase in price would cause his sales to plummet to zero. But that is an unreasonable assumption with regard to a differentiated product; there is no perfect substitute for *Mortal Kombat*.

Last is the appeal from the dismissal of the cross-claim against Gnat and Slupik. Milgray fired them apparently not knowing that they were still operating Microcomp though they had promised years earlier to terminate this unauthorized competition with their employer. Milgray gave them severance pay in exchange for a blanket release of any legal claims they might have against Milgray; Slupik had threatened to sue for age discrimination. In exchange for their release, Gnat and Slupik received an equally broad release of any claims that Milgray might have against them. Milgray now argues that because Gnat and Slupik were, as employees, fiduciaries of Milgray, they were required before accepting the releases to disclose that they had breached their fiduciary duty to Milgray by competing with it through Microcomp.

The district judge was right to dismiss this claim. (He dismissed Milgray's counterclaim against Williams at the same time, on the ground that the release of Gnat and Slupik released their alleged joint tortfeasor as well. Milgray acknowledges that the ruling was correct if Gnat and Slupik were released.) It is true that a release, however broad in its terms, might be obtained by fraud, or by a breach of fiduciary obligation, and in either event it would be unenforceable. *Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1341 (7th Cir. 1992); *Cwikla v. Sheir*, 801 N.E.2d 1103, 1112 (Ill. App. 2003); *Phil Dressler & Associates, Inc. v. Old Oak Brook Investment Corp.*, 548 N.E.2d 1343, 1347 (Ill. App. 1989). But Gnat and Slupik had already

been fired when they negotiated for the release. They were no longer fiduciaries of Milgray; they were negotiating at arm's length. They could not without being guilty of fraud make misrepresentations to induce the release—if asked, they could not have denied their shenanigans with Microcomp. But unless they were fiduciaries, they had no legal duty to disclose damaging information merely because it would be valuable to the person on the other side of the negotiation. E.g., *Weisblatt v. Colky*, 637 N.E.2d 1198, 1200 (Ill. App. 1994); *McCormick v. McCormick*, 455 N.E.2d 103, 112 (Ill. App. 1983). That is about as fundamental a principle of commercial law as there is. People would have little incentive to hunt for bargains if they had to disclose to the seller the true value of the seller's property. See *Laidlaw v. Organ*, 15 U.S. (2 Wheat.) 178, 194-95 (1817); *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 593-94 (7th Cir. 1991); 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 4.11, pp. 472-74 (3d ed. 2004); Anthony T. Kronman, "Mistake, Disclosure, Information, and the Law of Contracts," 7 *Journal of Legal Studies* 1 (1978).

To summarize, the judgment is affirmed insofar as it dismissed the cross-claim and Williams's RICO and antitrust claims, but is otherwise reversed, and the case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*